The next argued case is number 171376, Intellectual Ventures I against FTD Companies and J.Crew. Mr. Hurt. Thank you, Your Honor. Good morning. May it please the Court. My name is Christian Hurt. I'm here this morning on behalf of Intellectual Ventures. This is an ALICE appeal that involves two patents, the 715 patent and the 370 patent. I'd like to focus on the 715 patent today and, time permitting, move on to the 370 patent. The 715 patent claims eligible subject matter. And that's evidenced by three points in the PTAD's institution decision in parallel CBM proceedings. First, the claims address a technical problem with computer networks. Prior, our computer architectures did not sufficiently allow a user to access and view both public and private data simultaneously. And the PTAD references this in Appendix A305 to 306. Second, that problem required a technical solution to facilitate the delivery of integrated public and private data from disparate websites. And third, that solution in the 715 patent, as was the case in DDR Holdings, is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. And the PTAD specifically made that finding on A306. And as this Court has held in multiple cases, when patents check those boxes, they're eligible for patent protection. Yes, Your Honor. I want to understand what claims we're really looking at. You say that the Court erred in concluding that certain claims were representative. But why do you say that they weren't representative? Specifically, the 715 patent, there's really two sets of independent claims, Claims 20 and Claims 34. Both have in them the inventive aspect of this case, which is the integration and delivery of public and private data from the back-end server. And that's recited in Claim 20 from delivering from the network to a user system. And it's expressly also in Claim 35. So why is Claim 20 not representative? I believe it is, but we've separately argued each of the claims in the Alice analysis requires that. I think Claim 20 and Claim 35 do have that same aspect and are going to rise and fall together. So we argued them separately because they are separate claims. Okay, but your statement then in your brief that they weren't representative, you agree now that they're representative, that Claim 20 is representative. Right, that's correct. In fact, under our view of the claims, Claim 20 is a representative claim on which to assess eligibility of the independent claims. Okay, so where in the 715 does it say that the computer has to perform the integrating step? So in the 715 patent, in particular in Claim 20, there's the recitation of a network. And that method is performed in the network, and each of the steps are performed by the back-end computer system. And that's in both the preamble and each of those elements. And as the PTAB concluded and found in NA306 that assessing that same claim, Claim 20, that this patent is an improvement in how computer systems function. And used the words of DDR Holdings that it was necessarily rooted in computer technology. So that's part of this record and something at the Rule 12 stage, viewing the patent in the light most favorable to the patent owner. So you're saying it's the preamble that says that the computer has to perform the integrating step? Well, it's the preamble as well as the actual language of the claim. So even if the preamble is limiting, the preamble just talks about delivering data over a network. It doesn't expressly state how or to what extent the computer is performing the integrating step. The integration as read in light of the specification is in the computer, and this is why we argued Claim 35 separately because that claim expressly teaches or recites that the host computer, the application server that's in the back-end, is what performs the integration. And one ordinary school in the art would read Claim 20 as requiring each of these steps in a computer. And I don't think that's disputed by J.Crew in this case or was something that the district found. The specification says that the computer equipment is generic. It says a user may use any input device such as a keyboard, mouse, kiosk, personal digital assistant, handheld computer, cellular phone, and the like. Or it could be used in conjunction with any type of personal computer, network computer, workstation. I mean, what is it in the specification that recites anything other than generic computer equipment? So the system Your Honor is referencing is the user system, which is what receives the information. The host system is what delivers it, and the specification does describe the user system and the host system, like most software patents, as being able to run on what was existing at the time. So the inventive piece, which is what the PTAB found, and it's necessarily rooted in computer technology finding, is the new use of this computer system, this unconventional method of being able to deliver public and private data by taking them from two different sources and integrating them in the back end. But where in the spec does it describe the integration step? It describes the integration step in a few different places, and it is fairly high level where it mentions integrating the public data and the private data. There's a detailed or a more detailed description in connection with Figure 3, which shows private data and public data, and then those two are aggregated through some aggregation utilities, which ultimately coalesce in an interactive promotion service that delivers the integrated data. And that is the level of detail. And it's about the same level of detail as DDR Holdings, in which you had a claim that recited a host component that had web pages in it with the original store's website, and when someone clicked on the link, there would just be a check to see, was this the link that would send the user to a third-party website, and if so, generate a hybrid web page. And that was the level of detail in that one. What is it about Figure 3 that you think is meaningful? Because you never cited Figure 3 in your briefs. We cited... Figure 6. Well, Figure 6 is the ultimate delivery of the integrated data, which the public data portion and the private data portion shown on the screen. Some of the back end for that on the integration step is in Figure 3. So Figure 6 is what the user is seeing when the system integrates the private data, which in Figure 6 is specific account data associated with the credit card, the balance, things like that, and the public data, which is the MyCards graph, which is promotional information that's going to be determined by that private card data. But the description of the integration is the most detailed it is in Figure 3, and it is at a high level in the patent, but that does not doom the claims, or otherwise it would have doomed the DDR holdings patent, and the PTAB in Appendix 306 would not have concluded and, one, agreed with IV that this patent solved the technical problem, that technical problem required a technical solution, and that this patent was necessarily... But there was no 101 analysis done by the PTAB in connection with the CBM determination, was it? That is correct, but there were discussion and findings that were issued, and just because it was in connection with a technological invention rather than an ALICE analysis does not mean those findings can't bear on the ALICE analysis. So copying, for instance, is evidence that can be used for secondary considerations evidence, but that same copying evidence also bears on willfulness and induced infringement, and that's the analysis that we put for here is the specific language used by the PTAB, especially the language that is right out of DDR holdings about the computer roots of this patent to solve a problem specifically arising in computer systems with a particular solution is certainly indicative that this patent is eligible, especially when we're at the Rule 12 stage and the district court has to credit that. So yes, it was not an ALICE analysis, but this particular finding certainly can carry over into an ALICE analysis. Can you show me where in the written description in describing Figure 3, even if we're looking at Figure 3, it explains how the integration step occurs? So the closest, Your Honor, is in Column 10. It talks about right at the bottom, 57 through Column 11. We're in Column 10? Beginning right around lines 57. In this description, the term integration is not used, but what is described is the data flow in Figure 3, and the discussion goes from Column 10, line 57, through Column 11, line 65. And what it's discussing, and again, it does not mention specifically integration, but is the flow, the word integrating is not there, but the flow of data from the transactional assets 302, which is the private information. That's the My Account information, the private data. And the public, the content assets, which is the public information, and it shows how that data flows through the aggregations, utilities, and is ultimately delivered as integrated data in Figure 3, but there's not a specific discussion about using the word integrated. What's unconventional about what's described here? What's unconventional about the 715 patent is that in Figure 3. Figure 3 in Column 10 to 11, what's unconventional about this description? The part that is unconventional is taking those two sets of data and integrating them in the back end for delivery on a network so they can be viewed on a single screen simultaneously. So there's nothing unconventional about the how to do it? Well, under the record in the 715 patent, in the prior art, there wasn't particularly a way to do this. If you're always referencing, is there new hardware here? They didn't invent a new way of doing this, right? It's just the idea of doing it. There's no description of invention as to how to do it. How to do the integration? Yeah. So the specification just mentions that the data is integrated in the back end. That's as much of the how that's in the patent. And the back end, you mean at the final output is your back end? No, back in the host server. So it's delivered as a single integrated data. But it doesn't explain how that occurs. It does not in detail explain the integration. It teaches the sources of the data, where to obtain them from, that it is integrated. But if that were fatal to this patent, it would have also been fatal to the patent in DDR Holdings, which didn't teach how to generate in the claim, at least, the hybrid web page, just that one was generated. And that was sufficient on a full trial record. In this case, we're at the Rule 12b6 stage with the PTAB's findings that mirror the findings in DDR Holdings. That evidence should have been credited by the district court, and it wasn't had it been that defeats a Rule 12b motion. But you're not saying the district court was bound by that, are you? At the Rule 12 stage, the court has to credit, has to view the patent in the light most favorable to the patentee. If we were at summary judgment and there was other evidence in the record, sure, the court can come to a contrary conclusion. But when you're looking outside the patent, and that's all that is out there is the PTAB findings, which are intrinsic to the patent, that should have been sufficient to defeat a Rule 12 plausibility motion. Unless the court has further questions, I'm into my rebuttal time. Okay. Thank you, Mr. Burke. Thank you, Your Honor. Mr. Berland. May it please the court. The district court, with respect to both of these patents, carefully and correctly ruled that they were ineligible under Alice. And I think one of the few points of agreement between the parties is that this is a straightforward application of Alice to both of these patents. I think the line of questioning from the panel has enumerated a number of points that I wanted to make as well. First, we've established that Claim 20 of the 715 patent is representative. And the claim language claims only the abstract idea of combining data from two sources for delivery to a user. The district court correctly noted, and as Judge O'Malley noted, there's no language in the specification that ties this to specific computer equipment. It literally describes computer equipment as any computer equipment, a network as any network, a data store as any data store. And in that respect, there is no web focus, which Intellectual Ventures attempts to read into that claim language, trying to bring it within the scope of DDR holdings, which addressed a specific problem with implementation of web technology. All we have here is the basic idea of issuing a bank statement or a credit card statement that contains certain general data, public data that is available to the general public, the latest interest rate offer from the bank, and private data defined as transaction history or balance records, something that only an account holder would need to have. What's your response to his argument that this is more like DDR holdings? With respect, as I mentioned, in the DDR holdings case, that addressed a specific problem with web technology, of how to retain visitors on the site who are expressing interest in a third-party website. And the panel that addressed that case found there was sufficient innovation in computer technology to overcome the Alice hurdle here. By contrast here, we have claim language that says simply, as the court has held in a number of other cases, what you're doing is taking an abstract idea and instructing your reader to perform it on a computer, performing routine functions with generic equipment in a known environment. And under a number of cases from this court and Alice, that doesn't get you over the hurdle in Section 101. This case is distinguishable from DDR on that basis. Well, you've got the claim chart that DDR holdings comparison chart that appears in the blue brief at pages 22 and 23. What is your response to those comparisons? Well, those are comparisons, as your line of questioning indicated, those are comparisons between what the court held to be the claims of the DDR patent and the specification of the 715 patent. Language that does not automatically get imported into the claims, which are the focus of the Alice analysis. When one looks at the broad claim language, even coupled with the specification language, which is an equally high level of generality, the only way that they get to a comparison is to take specific details from the specification, implicitly read those into the claims, and then attribute them to the claims. And that's not the proper way of reading the claims, and that's not the proper context for these claims. What's your response to the fact that he says that in DDR holdings, they didn't explain the how, they just explained ultimately what the solution is? Well, I would say that the solution in DDR holdings, the solution as described there was implicated in the technological innovation. Is there any issue about the how in DDR? I don't have it in front of me, and I don't recall that there was. Was there an issue about that? I would agree with Your Honor that that was not specifically addressed, but to the extent that one wants to contrast the two. Authority if it wasn't addressed. I would certainly agree with that, Your Honor. And I would say that, as I've said, DDR was focused on the problem-solution issue, as opposed to here where we have an abstract idea implemented on general-purpose computer equipment. With respect to the purported inventive concept, the contrast between public data and private data, the district court quite rightly ruled that those were subjective criteria. It was the bank that decided we're going to label certain data public, we're going to label certain data private, and we're going to then integrate those into a single document that resembles nothing more than a bank statement. And that kind of subjective component, based on business logic, doesn't surmount the Alice Step 2 hurdle either. With respect to the board decision and its impact, if any, on the district court, Intellectual Ventures has not cited and cannot cite an authority that this is a binding ruling, that the district court was obligated to follow. And it's not clear what it would mean for the district court to follow that ruling, because it was addressing a jurisdictional issue at a different stage of the proceeding. The record in this case shows that with respect to a third patent that has since dropped out of the case, this is at APPX 321 to 325, the board decided to institute a covered business method review and then proceeded to perform the Alice analysis in the two steps to conclude that the claims of that patent were more likely ineligible than not. The reason the board didn't get to that decision point with respect to the 715 patent is it decided it didn't have the authority to make that judgment. And the district court is not bound to follow, and it's not clear how it would follow a jurisdictional determination by the board that if valid, the patent claimed a technical invention rather than primarily a business method. With respect to the 370 patent, unless the court has further questions on 715, we have a similar situation where computer implementation appears there as with the 715 patent only in the preamble, generally not viewed as limiting, but that's neither here nor there for present purposes. And it describes the abstract idea of recommending products to customers based on past purchase history of an item of interest to a consumer. It's a scenario in which I'm in a bookstore. I have a copy of Moby Dick that I'm going to buy. The clerk recalls that people who buy Moby Dick also buy the Scarlet Letter and recommends that to me.  And that basic step of computer implementation doesn't survive the ALICE test. At most, it provides an improvement in speed and efficiency, the kind that Intellectual Ventures versus Capital One demonstrates does not create an inventive concept. And similarly, the inventive concepts that Intellectual Ventures points to with respect to that patent is tied to the claim language of filter data, which just like public and private data from the 715 patent is defined solely as a product of interest to a customer. Namely, it's the subjective input of the customer that determines the business logic of what gets recommended. There's nowhere in the patent is there an improvement in computer technology, let alone a software algorithm adequately described. And I'm open to questions from the panel on any issues relating to the patents, but otherwise, I've concluded my remarks. Thank you, Mr. Berlin. Thank you, Your Honor. Mr. Hurd. Very briefly, Your Honor. Judge O'Malley's question about DDR holdings, I think, was particularly instructive because Jay Crew's distinction was, well, in our case, we're trying to distinguish why this is a technical solution. They didn't discuss the how in DDR, did they? The how does not appear to be an issue in DDR holdings, but if it was an issue or had been, that was not fatal to the claims. But there was no, as far as I can tell, anything in the opinion about the how, but DDR holdings is still precedent of this court, and I think applies to this case. And the only distinction was, in our case, we're relying on the specification for providing the problem. Well, the problem that DDR holdings sought came from the specification, and this court has held in multiple cases. But the claims are what defines patent eligibility, correct? That is correct. Isn't that a little bit of a problem with your chart, in that you compare the spec to DDR's claims? You don't compare your claims to their claims. I disagree with that on the chart. The question is, what was the technical advance? And that's the problem-solution analysis in DDR. And to determine, well, what was the problem you were trying to solve? That almost always comes from the specification. Then when you look at, well, what's the solution? That's when the claims come in, and what's the advance in the solution? That also comes from the specification, and that's what this chart in our brief is getting at, because the problem in DDR, like in every other patent, or most patents is from the spec. The claims show the advance, and the question in determining, do we have a real technological invention, technical problem, technical solution, that's necessarily rooted in computer technology? You have to look to the rest of the patent to determine that. I'm over my time, unless the Court has any other questions. Thank you both. I will sit down. Thank you. Thank you, Your Honor. Thank you both. The case is taken into submission.